### QUICK'S EXECUTOR *vs.* QUICK and others.

1. The rule in Shelley's case must govern in the construction of wills made prior to June 13th, 1820, in all cases where it is applicable.

2. The rule applies, even when another estate for life is interposed between the death of the first tenant for life, and the estate to his heirs.

3. A devise, upon the decease of a tenant for life, to heirs "as the law directs" in case of dying intestate, means as the law was at the time of making the will, and not as it might be at the death of the tenant for life.

4. Such limitation, as it gives the estate at the death of the life tenant to persons who may not then be his heirs-at-law, or in shares different from those prescribed by the law at that time, prevents the application of the rule in Shelley's case. And the heirs of the tenant for life, or such persons as would have been his heirs, had he died at the date of the will, must take as purchasers at the death of the tenant for life.

This cause was argued on final hearing, upon the pleadings and proofs.

*Mr. Van Fleet,* for complainant.

*Mr. Bird,* for defendant, S. G. Quick.

B

*Mr. Wurts*, for defendant, Jonathan Quick.

*Mr. Blake*, for the other defendants.

THE CHANCELLOR.

The object of this suit is to procure the direction of this court as to the duty and power of the complainant as executor of Ezekiel Quick. For this purpose it is necessary to settle the construction of provisions in the will of Jacob Quick, the father of Ezekiel, as well as those in the will of the latter. Jacob Quick died in November, 1816; his will was executed on the 28th day of August, 1808, and admitted to probate December 11th, 1816. By it he gave a farm of 120 acres to his son Ezekiel for life, and to his widow, in case he should leave one, during her widowhood only; and then directed, "and at the decease of his widow, the said devised tract of land is to go to his heirs, to be divided among them as the law directs in case of dying intestate."

Ezekiel Quick died July 1st, 1867, having made a will, dated January 18th, 1848, which was admitted to probate July 19th, 1867. By this he gave to his wife, for her life, the farm devised to him by the will of his father, and which he occupied as his homestead; and by the next clause of the will he annexed to that farm a strip of eight acres on the west side, which he had purchased from the heirs of his brother, and directed that it should be held as part of that farm forever. In the fifth clause he gave to his son Richard a farm of 130 acres; and in the sixth clause, reciting that his son Richard, by the will of Jacob Quick, was entitled, at the death of his mother, to one-sixth of the farm on which he, the testator, then lived, and that Richard, for full consideration, had conveyed that sixth to him, he gave and bequeathed all the right of Richard so conveyed to him, to his son Jonathan, in fee; and he provided that if Richard, or any one for him, should try to hold the right so conveyed to him, and by him devised to Jonathan, that, in such case, Richard should not have the farm he had devised to him, but that it

should go to Jonathan. He gave $300 to each of the four sons of his deceased daughter, Elizabeth Lewis. He expressly declares that he shall make no bequest to Ellen and William Hoppock, the children of his deceased daughter Sarah, as they were well provided for otherwise. To his son Joseph, he gave a farm, and to his son Charles, $1800. He ordered his executors to sell all his property not otherwise disposed of by that will, and after paying his debts and expenses, to pay the remainder to his two sons, Charles and Jonathan.

The heirs of Ezekiel at his death were his four sons, Richard, Jonathan, Joseph, and Charles, and the four sons of his daughter Elizabeth, and the son and the daughter of his daughter Sarah.

The will of Ezekiel was evidently written under the impression that the will of his father vested in him only a life estate in his homestead farm, with the remainder, after the death of himself and his wife, to the persons who would be his heirs. If he had supposed that Jacob's will gave him the fee, as it is contended that it did, he would have made a different disposition of his property; and by such construction his intention in disposing of his own property among his children will be entirely frustrated. But whatever effect this consideration might have upon the construction of the will of Ezekiel, it can have none upon that of Jacob. It must be construed according to the settled rules of law.

The question on Jacob's will depends upon the application of the rule known as the rule in Shelley's case. By that rule, when the same instrument which gives an estate for life by express words, in a subsequent part gives the same property, at or after the death of the life tenant, to his heirs, or the heirs of his body, the grantee or donee for life takes an estate of inheritance in fee or fee tail, and his heirs at his death do not take as purchasers, but inherit by virtue of the limitation; and this rule applies even where another estate for life, as in this case, is interposed between the death of the first tenant for life and the estate to his heirs. This rule, which is in harmony with the theory of the common

law with regard to the conveyance and transmission of lands, has been settled as the law of England for centuries, and has been adopted, by repeated decisions, as the law of this state, and is still the law of this state as regards the construction of deeds. But it is one of those artificial rules of construction which gives to the terms used for these provisions an effect different from that suggested by them to any one not versed in these rules, and therefore it was found often to mislead testators, and its application to disappoint their evident intentions, and, as in this case, to mislead the devisees; and it was, therefore, so far as wills are concerned, in effect, abolished in this state by the first section of an act passed June 13th, 1820. *Rev. Laws* 774. But it was in force at the date of this will, which must be construed by it if, by the decisions in England and this state which control our courts, it applies to this will.

In *Kennedy* v. *Kennedy*, 5 *Dutcher* 185, in construing a devise similar in most respects to this, the rule and its application were carefully considered by the Supreme Court in an opinion delivered by Chief Jus tice Whelpley. The decision in that case, it being the decision of the law court to whom such a question most properly belongs, and the decisions of the English House of Lords in *Jesson* v. *Wright*, 2 *Bligh* 1, and of the English Court of Common Bench in *Jordan* v. *Adams*, 6 *C. B.* 764, which are cited with approbation, and relied on in *Kennedy* v. *Kennedy*, must guide this court in the application of the rule.

In *Kennedy* v. *Kennedy*, the court held that the rule in Shelley's case is the settled law of this state, and that no discussion of the principles upon which it is founded is necessary. " That it was adopted to give effect to the paramount intent of the testator. The word heirs will yield to a particular intent that the estate shall be only for life, and that may be from the effect of super-added words, or any expression showing the particular intent of the testator; but that must be clearly intelligible and unequivocal." In that case the devise was " to my son, R. H. Kennedy, and to his

proper benefit and behoof during his natural life, and to his heirs, to be divided among them as the law may direct, after his death." In that case there was no other provision to affect this devise. The gift to heirs to be divided as the *law may direct*, is a gift to heirs *as heirs*, and as the law of inheritance may then be; and this shows no particular intention contrary to the paramount intent of the testator carried into effect by the rule in Shelley's case, or that could interfere with the application of the rule.

In *Jesson* v. *Wright*, the devise was to W. for his natural life; after his death, to the heirs of his body, in such shares as he should by deed or will appoint; and for want of such appointment, to the heirs of his body, share and share alike, *as tenants in common;* and if but *one child*, the whole to *such child.* The Court of King's Bench, which first decided this case, held that there were sufficient indications of a contrary intent to take this devise out of the rule in Shelley's case. In the House of Lords, Lord Eldon held that the paramount intention to give the remainder " to the heirs of the body," a technical expression which has a certain settled meaning, was not overruled by any clearly expressed particular intent; that the provisions for holding in such shares as W. should appoint, or as tenants in common, was impossible. There can be but one heir of the body at the same time in England, the next heir only comes into being at his death, and therefore they could never hold as tenants in common, or in shares under an appointment.

Lord Redesdale, in his opinion in that case, held that the words heirs of the body, having a clear settled technical meaning, could not be controlled without some clear expression or necessary implication. " *That technical words should have their legal effect, unless from subsequent inconsistent words it is very clear that the testator meant otherwise.*" That although heirs of the body cannot take as tenants in common, it does not follow that the testator did not intend that heirs of the body should take, because they can not take in the mode prescribed.

In *Jordan* v. *Adams*, Erle, C. J., in delivering the opinion of the court, says that it is clear that a devise to a man for life, with remainder to the heirs male of his body, does create an estate tail, "unless a judicial mind sees with reasonable certainty, from other parts of the will, the testator's intention;" and that the court, while aware of the importance of maintaining the doctrine of *Jesson* v. *Wright* where it applied, thought, for reasons assigned, that it did not apply in that case.

The terms of the devise in Jacob Quick's will are much the same as those in the case of *Kennedy* v. *Kennedy;* in that case the devise was to R. H. K. during his natural life, and to his heirs to be divided among them *as the law may direct* after his death. In Jacob Quick's will the devise is to Ezekiel during his natural life, at his death to his widow during widowhood and no longer, and at her decease to go to his heirs to be divided among them *as the law directs* in case of dying intestate. The intervening life estate does not affect the application of the rule, and unless there is a difference of intention clearly indicated by the words "as the law directs," from that indicated by the words "as the law may direct," this case must be governed by the decision in *Kennedy* v. *Kennedy*. In that case the words as the law may direct in a devise to heirs as heirs, indicated that the testator intended that they should take as heirs by inheritance, as the law of inheritance should direct at the termination of the life estate. In this case the testator first indicates that his paramount intention was to give it to such persons as should be the heirs of Ezekiel at his death, but he as clearly indicates that he intended to control the division of it among these heirs, and that not by the law as it might stand at the death of Ezekiel, but as it then stood; "as the law directs," means this, in contradistinction to the law as it shall then stand, indicated by the words "as the law may direct." At the date of this will, 1808, the act of 1780, (*Pat. Laws* 42,) the first statute to regulate descents passed in this state, was in force. That had abolished the English

law of primogeniture and the exclusion of female descend-
ants, and gave to each female in the same degree from the
ancestor, one share to two shares to a male.  This remained
the law of the state until it was changed by the act of Febru-
ary 5th, 1816, (*Pamph. Laws* 7,) by which males and females
inherited equally.  This law of descent was strongly im-
pressed upon and well known to all the freeholders of the
state.  There was a strong inclination among them towards
some preference of male heirs over females, long after the
abolition of the exclusive preference and the law of primo-
geniture, and it was retained for years after the act of 1816,
as will be shown by the records of wills in all the counties
of the state.  The law, as it existed in 1808, was well known
to Jacob Quick, and he expressly adopted the division of two
shares to a male, and one to a female, as the mode of divi-
ding his property among the children and descendants of
his son.  The will would not be more clear if he had used
the words of the act of 1780, instead of the words "as the
law directs."

No one can doubt but that Jacob intended that Ezekiel
should have an estate for life only, without power of alien-
ation, but that intention is overruled by the rule in Shelley's
case, which gives construction to the words he has used,
whatever may have been his intention, unless he has clearly
and by positive words declared an intention capable of being
executed, inconsistent with that rule.  The English courts
have repeatedly held that a devise to the heirs, or heirs of
the body of the tenant for life, as tenants in common, or
equally to be divided between them, did not prevent the
operation of the rule, although it might indicate a different
intention on the part of the testator.  But this seems placed
upon the ground, that as by the law of England, but one
heir or heir of the body could exist at one time, the heirs
or heirs of the body could never be tenants in common;
and that as the words heirs or heirs of the body were tech-
nical terms with well settled meanings, they could not be
overruled by a subsequent disposition, which could not be

carried out if the legal meaning was given to the word heirs, but only by a positive subsequent disposition entirely inconsistent with that meaning. This was the foundation of the reasoning in the judgments of Lords Eldon and Redesdale in *Jesson* v. *Wright;* and the reasoning of Justices Erle and Williams in *Jordon* v. *Adams*, by which they show that the clear provisions of the will in that case took it out of the rule, is founded on the same principle; and of the declaration of Chief Justice Whelpley in *Kennedy* v. *Kennedy,* "that the words *heirs* or *heirs of the body* will yield to a particular intent that the estate shall be only for life, and that may be from the *effect* of the superadded words, or any expressions showing the particular intent of the testator, but that must be clearly intelligible and unequivocal." And the effect of the strong and clear words "to him, his heirs and assigns forever," the words peculiarly chosen for giving a fee simple, will be limited and overruled by clear words in a subsequent part of a will, giving the estate over in case the devisee dies without leaving issue at his death.

In this case, the paramount intent of the testator to give this farm to the heirs of Ezekiel, at his death, is not overruled or frustrated. The persons to whom it will go are his heirs, in any sense of the term; the same persons to whom it would be given by the rule in Shelley's case. And this paramount intent is not affected, nor is the word heirs given a sense or meaning different from what was its legal meaning; it is used precisely in what was its legal meaning in 1808, at the date of this will.

The will of the testator that the males shall, in the division, have two shares to each share by a female, is expressed as clearly, unequivocally, and intelligibly as is required in the cases above cited. And the only way by which this intention can be carried out, is to declare that this devise is not within the rule in Shelley's case. By this conclusion, the intention of Jacob will be fully carried out, without violating any rule of law, and the intention of

Ezekiel, founded on this construction of the will, will also be carried into effect. He had a right to assume this to be the legal construction, because this court, in *Quick* v. *Quick*, *Sart.* 4, where a devise in the same will to another son, made in the same words, came in question, the court took for granted that it gave an estate for life only, with remainder over to the persons who were his heirs.

Although the act of 1780 was changed at the death of Jacob, in November, 1816, yet this will speaks as of the time it was executed, and the farm will go to Ezekiel's children as if he had died in 1808; that is, one-fifth to each of his four sons, except Richard, one-fortieth to each of the four sons of his daughter Elizabeth, one-fifteenth to the son of his daughter Sarah, and one-thirtieth to her daughter.

Richard Quick conveyed one-sixth of this farm to his father, Ezekiel, in his lifetime. On account of the contingent nature of his estate, that deed may not have been efficient as a conveyance in Ezekiel's life; yet, as it was with full covenants, and Richard survived his father, it is a good conveyance by estoppel, and the devise of that one-sixth to Jonathan vests it in him, in addition to his own one-fifth. He is, therefore, entitled to eleven-thirtieths of this farm, and Richard retains one-thirtieth. The strip of eight acres which Ezekiel annexed to this farm, as part of it, forever, by virtue of that annexation must go with it, and be considered as devised to the owners of the farm.

Upon this view of the case, neither the homestead farm occupied by Ezekiel, nor the strip annexed to it, can be held as part of his property undisposed of; and, of course, the executor has no power to sell either.

The examination of the case has satisfied me that the diversity of views taken of the questions involved, by the courts, made it a proper case for the complainant to ask the opinion of the court upon his duty and power, and I shall, therefore, order his costs, including a proper counsel fee, to be paid out of the estate. As the defendants have caused no unnecessary expense, but only such as was necessary to bring

the case fairly before the court, I think their taxable costs ought to be paid out of the estate; but their counsel fees and other expenses must be paid by themselves. These expenses would have been necessarily incurred in settling their rights as between themselves.